## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**PETER J. MARINELLI,**                 )
                                        )
         **Plaintiff,**                 )
                                        )         **Civil Action No.**
         **v.**                         )         **07-40223-FDS**
                                        )
**JOHN E. POTTER, POSTMASTER**          )
**GENERAL, UNITED STATES POSTAL**       )
**SERVICE,**                            )
                                        )
         **Defendant.**                 )
_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil action alleging discrimination and retaliation against a mail carrier by his

supervisor in the Southborough Post Office in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967, 29

U.S.C. § 623 *et seq.*

Plaintiff, Peter J. Marinelli, who is now proceeding *pro se*, alleges that he became the

target of a campaign of harassment as a result of his participation in an Equal Employment Office

investigation of his allegations of age discrimination.  On August 16, 2007, he filed a two-count

complaint for age discrimination (Count 1) and retaliation (Count 2), naming John E. Potter, the

Postmaster General of the United States Postal Service, as the defendant.

Plaintiff has voluntarily dismissed his claim of age discrimination.  Defendant has now

moved for summary judgment on the retaliation claim.  For the reasons stated below, the motion

will be denied.

## I.      Background

The following facts are presented in the light most favorable to plaintiff.

### A.      Initial Disputes

Peter Marinelli began working for the United States Postal Service in 1973.  In 1985, he became a rural route mail carrier in the post office in Southborough, Massachusetts.  In 1998, Joseph Mulvey became the Postmaster in Southborough.  According to Marinelli, he and Mulvey had an unremarkable working relationship for the first four years they worked together.  This changed starting in 2002.

Marinelli and Mulvey first clashed during the March 2002 "count period" that sets postal carrier compensation for the following year.  According to Marinelli, during the count period the mail is sorted into tubs for each route.  Postal employees then further sort and count the types of items in each route, such as ordinary letters, parcels, letters requiring customer signatures, larger flats, and so on.  The number of each kind of item for the route is then written on a Post-It Note that is stuck on the tub.  The object of this exercise is to determine how long it takes each carrier to perform the tasks of his or her route.  The results affect the mail carriers' compensation. Apparently, the U.S. Postal Service publishes a Rural Carriers Handbook that prescribes certain rules to govern the process.

During the March 2002 count period, Mulvey announced that certain time that was historically included in the count would now be excluded.  Marinelli told Mulvey that such a change violated the Handbook.  According to Marinelli, Mulvey became angry, grabbed the book, and told him to get back to work.

A similar incident occurred in August of the same year.  According to Marinelli, Mulvey announced a new policy concerning when carriers would start their work day.  Marinelli "suggested that this was inefficient and would delay customer delivery."  (Pl. Opp. at 2.)  At this suggestion, Mulvey became upset and said:  "Pete, you're a good carrier, but why don't you get out?  Why don't you retire?"  (Pl. Opp. at 2.)  At the time, Marinelli was one of the oldest carriers in the post office, but he was not yet eligible to retire.

After that incident, relations between the two men deteriorated.  Mulvey began to single out Marinelli for reprimand based on alleged minor infractions.

On October 28, Mulvey threatened to discipline him for the condition of the address labels on his mail-sorting racks and for not signing some of his sign-out sheets.  Marinelli contends that other mail carriers had engaged in the same practice, without comment.  When Marinelli invoked his right to have a union steward present when discipline is threatened, Mulvey refused.  According to Marinelli, Mulvey ordered him to sit down and stated:  "if you don't change your attitude, I will make your last three years miserable."

On December 26, 2002, Mulvey accused Marinelli of arriving five minutes late to work and falsifying his time sheet.  Marinelli contends that he arrived on time.  Mulvey threatened him again, saying "I could hang you for this."

In January 2003, Mulvey again took issue with the arrangement of Marinelli's sorting racks.  Marinelli had recently acquired new stops on his delivery route and had adjusted the cells in his racks to make room for the stops.  Mulvey did not approve of the manner in which he made these adjustments and required him to redo it.  Marinelli contends that this kept him at work for

three extra hours before a holiday weekend.[1]

On March 3, 2003, Mulvey performed an inspection of Marinelli's delivery route, following him on the entire route.  The next day, he reprimanded Marinelli for delivering mail out of sequence.  According to Marinelli, in 2001, Mulvey had granted a customer's request to have his stop delivered earlier in the route, which is why there was an out-of-sequence delivery. Marinelli reminded Mulvey of the arrangement.

The 2003 mail count took place in February and March.  On March 11, Mulvey warned Marinelli that if he ever made a mistake in the count in his favor, he would be "in big trouble" if he did not bring the error to Mulvey's attention.  The next day, Mulvey came to Marinelli's work station and requested his personal count notes from the previous week.[2]  Marinelli did not have the notes with him.  Mulvey told him to bring them next day.  He then asked Marinelli for the Post-It Notes that management prepared for the tubs during the count.  Marinelli explained that he had already discarded them.  Mulvey refused to tell Marinelli why he was seeking these items. Two days later, Mulvey again asked for Marinelli's personal count notes.  Marinelli stated that he was not willing to provide them.  At this, Mulvey became angry.

On March 17, Marinelli contacted an EEO counselor named Marcia Condon and began the EEO counseling process.  Meanwhile, his confrontations with Mulvey continued.

On April 2, Marinelli's immediate supervisor issued him a Letter of Warning—the first

---

[1] According to Marinelli, he is only allotted three paid minutes per week for updating his mail sorting rack and its cells and labels.  Thus, the extra hours were effectively unpaid.

[2] According to Marinelli, some mail carriers make their own notes during the count so that they can double-check management's count.  He contends that he was under no obligation to take his own notes on the count, or to retain them afterwards, and that he does not get paid for the time spent preparing them.

such form of discipline in his postal career—for his refusal to turn over the personal count notes. Marinelli alleges that the supervisor acted at Mulvey's direction. The same day, Mulvey denied Marinelli credit in the mail count for 125 mail flats that had been included in his count.

Two days later, on April 4, Mulvey denied Marinelli's request for "incentive pay" for the use of a private vehicle to deliver his mail route. At the time, mail carriers who purchased a new right-hand drive vehicle for use on their routes were entitled to a $500 incentive payment. Marinelli had purchased a new Jeep Wrangler and employed it in delivering his route beginning in February 2003. Mulvey denied the claim on the basis that the Wrangler would be too small to carry all of Marinelli's mail. According to Marinelli, the Wrangler is a common vehicle used by mail carriers.

B.     The Initial Grievance Procedures

A collective bargaining agreement between the Postal Service and the American Postal Workers Union has created a dispute resolution procedure by which the grievances of postal workers can be addressed. On April 11, Marinelli filed grievances arising from the incidents with Mulvey. The subjects of the grievance were the Letter of Warning, the flats credit denial, and the denial of his vehicle incentive payment. Marinelli ultimately prevailed on all three grievances.[3]

On April 14, at a meeting with Rolf Budd, the union steward for the Southborough Post Office, Mulvey told Budd that anyone who stood up for Marinelli would be in big trouble.

On April 16, Mulvey excused Marinelli from duty so that he could meet with EEO counselor Condon off-site. Marinelli and Condon met for more than an hour and then returned to

---

[3] He was credited for the 125 flats; he received the full incentive payment for his Jeep; and eventually the Letter of Warning was reduced to a "discussion" and purged from his file.

the post office together.  Condon informed Marinelli that she would be interviewing Mulvey as well.

On April 30, Mulvey threatened Marinelli in an attempt to induce him to drop his vehicle incentive pay grievance.  He said that if Marinelli lost the grievance, he would not be allowed to use his vehicle at all.

On May 15, a "service talk" for postal employees about the EEO process was held at the Southborough Post Office.  Acting supervisor Pat Jackson led the talk, but Mulvey stood next to her, intermittently interjecting comments.  At some point, he told the group, in substance, that someone in the office had filed a frivolous EEO claim.  He said "just because I treat someone different doesn't mean I'm discriminating against them."  According to one of Marinelli's co-workers at the time, Jim Barton, Mulvey "implied that some claims shouldn't have been filed.  To my knowledge, the only carrier who had filed an EEO complaint was Mr. Marinelli.  It appeared to me that the Postmaster must have been referring to Mr. Marinelli with his comments."  (Barton Aff. ¶ 6.)

## C.   Subsequent Developments

On May 29, Marinelli consulted a therapist about stress he was experiencing.  He had previously put in a sick-leave slip for the appointment.  On May 30, he was told that he had to provide documentation of the appointment before the leave could be approved.  According to Marinelli, this was a departure from customary practice in the office.  He submitted the requested proof, but also filed a grievance about the incident.  Again, he prevailed.  The Labor Relations Specialist concluded that "any [such] blanket policy should be rescinded" and that even under a case-by-case approach, "[i]n this instant case documentation may not have been necessary."  (Pl.

Opp. at Ex. 12.)

On June 19, Marinelli put in for vacation leave for late September, as he had done the previous six years.  His request was denied; the reason given was that the post office could not arrange substitute coverage.  Again Marinelli filed a grievance, contending that Mulvey had not made a reasonable attempt to find coverage.  Marinelli was ultimately awarded six of the seven days he had requested.

Meanwhile, on June 21, Marinelli filed a formal EEO complaint.

On July 1, the addition of new stops to his route again required Marinelli to rearrange his sorting rack.  Without discussing the issue with Marinelli, Mulvey rejected the new arrangement and required him to redo the labels for 42 sections of his rack.  According to Marinelli, this took him 50 minutes to complete.  On July 30, Mulvey ordered Marinelli to change all of the cells in his rack to double-size cells.  Marinelli contends that other carriers were allowed to continue using single-size cells.  Marinelli filed a grievance as to both the July 1 and 30 cell rearrangement incidents.  Again, he prevailed, and was awarded additional pay.  The Labor Relations Specialist concluded that while "management may determine cell size width" in accordance with the Handbook, determinations of cell size "should be consistently applied to all rural carriers in the office."  (Pl. Opp. at Ex. 13.)[4]

On August 23, Marinelli again sought vacation leave, this time for a period beginning seven months later.  The request was denied August 26, ostensibly because no substitute coverage was available.  Again Marinelli filed a grievance, which was settled.  Mulvey agreed to seek a

---

[4] Although the specifics are not clear, at some point Marinelli was also apparently directed to address route changes that were not his responsibility.  He was awarded extra pay for the work upon resolution of a grievance.

replacement and Marinelli was granted the leave subject to the availability of coverage.

###    D.    Marinelli's Medical Leave

Marinelli contends that as a result of Mulvey's conduct, he suffered from increasing stress and anxiety, and was treated for depression and acid reflux.  On September 9, his therapist and primary-care physician both recommended that he take a 30-day medical leave from work.  He notified the post office and took the leave.

Near the end of September, Mulvey sent Marinelli return-to-work forms.  On October 1, Marinelli called his supervisor and reported that he would report back to work on October 9.  On October 8, he stopped by the post office to drop off the paperwork.  According to Marinelli, Mulvey looked at the paperwork and said:  "Is that all you've got for me?  Is that it?"  He told Marinelli that he would not be allowed back to work the next day and that he would have to take the day as unpaid leave.  Mulvey refused to tell him what else he needed.  Not wanting to be listed as absent without leave, Marinelli reported to work as planned the following day.  Mulvey was not present.  Marinelli's supervisor, Glen Hall, assured him that he would not be considered AWOL and instructed him to complete another sick-leave slip.

However, later that day, Hall contacted Marinelli at home and said that he might be listed as AWOL after all.  Marinelli called Condon and the Occupational Health Office, and learned that Mulvey had sent him the wrong return-to-work forms.  The OHO faxed the correct forms to his therapist and he was ultimately cleared to work again on October 11.

A lull in incidents followed, as Mulvey was on leave.  However, on December 11, 2003, Hall called Marinelli to his desk to discuss whether the Jeep Wrangler met the requirement that private vehicles used by mail carriers be adequate to carry a normal load.  On January 9, 2004,

Hall and Marinelli met with a union steward on the Jeep issue.  At the conclusion of the meeting, all agreed there was no issue with the Jeep.  Nevertheless, on January 27, Hall called Marinelli into Mulvey's office and issued him a Letter of Warning for using a vehicle that did not meet Postal Service regulations.  Marinelli filed a grievance and amended his EEO complaint to include retaliation.  As a result of the grievance, the Letter of Warning was expunged.

On February 27, Mulvey accused plaintiff of damaging a customer's mailbox.  Mulvey did not investigate the damage personally, relying instead on a witness who turned out to be a four-year-old child.  Ultimately, at Marinelli's urging, the customer confirmed that he was not responsible for the damage to the mailbox.[5]

### E.    Procedural Background and Recent Developments

On February 10, 2006, Marinelli's EEOC complaint for unlawful employment discrimination and retaliation was dismissed without a hearing.  Marinelli's appeal of this dismissal to the EEOC's Office of Federal Operations was unavailing.  On May 11, 2007, the Office of Federal Operations upheld the administrative decision.

Marinelli commenced this action on August 16, 2007.  At the time, he was represented by counsel.  However, Marinelli's counsel withdrew their appearances in this matter on January 6, 2009, from which time he has been proceeding *pro se*.  In addition, at some point subsequent to filing his complaint in this matter, Marinelli retired from the Postal Service.

Defendant has moved for summary judgment.  Plaintiff has voluntarily dismissed Count 1, the discrimination claim, and is now proceeding solely on the basis of Count 2, the retaliation

---

[5] In his surreply memorandum, Marinelli refers to a third Letter of Warning in August 2004 for the first time.  The time frame of the complaint, however, extends only to January 27, 2004.  (*See* Compl. ¶ 27.)

claim.

## II.    Discussion

### A.       Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 65 (1st Cir. 2008) (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)).

### B.       Whether the Claim Survives under the Burden-Shifting Analysis

Defendant contends that Mulvey's actions after April 16, 2003, constitute unlawful retaliation for his complaints about age discrimination. Although the complaint invokes both Title VII and the ADEA, plaintiff has not suggested that he was the victim of discrimination on the basis of his race, color, religion, sex, or national origin, or that he was retaliated against for pursuing his efforts to enforce his rights under Title VII. Thus, the case appears to arise exclusively under the ADEA, specifically 29 U.S.C. § 633a, which prohibits discrimination on the basis of age in federal employment. Federal employees, including postal workers, who suffer "retaliation due to the filing of a complaint of age discrimination may assert a claim under the federal-sector provision of the Age Discrimination in Employment Act of 1967." *Gomez-Perez v.*

*Potter*, 553 U. S. ____, 128 S. Ct. 1931, 1935 (2008).[6]

In order to survive summary judgment, plaintiff must make out the elements of a *prima facie* case of retaliation.  In order to make out a *prima facie* case, plaintiff must prove that (1) he engaged in protected conduct under the ADEA; (2) he suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity.  *See Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 32 (1st Cir. 2007); *see also Fantini v. Salem State College*, 557 F.3d 22, 32 (1st Cir. 2009) (citing *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 22 (1st Cir. 2002)); *Fennell v. First Step Designs*, 83 F.3d 526, 535 (1st Cir. 1996) ("The analytical framework for ADEA discrimination and retaliation cases was patterned after the framework for Title VII cases, and our precedents are largely interchangeable.") (citing *Hazel v. U.S. Postmaster General*, 7 F.3d 1, 3-4 (1st Cir. 1993) (applying *McDonnell Douglas* framework and a unified retaliation analysis to claims under both the ADEA and Title VII)).[7]  *But see Gross v. FBL Fin. Servs.*, 557 U. S. ____, 129 S. Ct. 2343, 2349 n.2 (2009) ("[T]he Court's approach to interpreting the ADEA in light of Title VII has not been uniform. . . .  And the Court has not

---

[6] "The federal-sector provision of the ADEA provides that '[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age.'  § 633a(a) (2000 ed., Supp. V).  The key question in this case is whether the statutory phrase 'discrimination based on age' includes retaliation based on the filing of an age discrimination complaint.  We hold that it does." *Gomez-Perez*, 128 S. Ct. at 1936.

[7] In *Gomez-Perez*, the Supreme Court emphasized that the ADEA's prohibition on retaliation in federal employment does not arise from the ADEA's private-sector anti-retaliation provision:  "[O]ur holding that the ADEA prohibits retaliation against federal-sector employees is not in any way based on § 623(d).  Our conclusion, instead, is based squarely on § 633a(a) . . . itself, 'unaffected by other sections' of the Act." *Gomez-Perez*, 128 S. Ct. at 1941 (quoting *Lehman v. Nakshian*, 453 U.S. 156, 168 (1981)).  However, the same general framework that courts use in other ADEA and Title VII retaliation cases applies in federal-sector retaliation cases.  Thus, reference to private-sector provisions and case law are used for purposes of guiding the analysis only and should not confuse the underlying basis of the anti-retaliation protection.  *Cf. Deslauriers v. Chertoff*, 2009 U.S. Dist. LEXIS 33123, at *8 (D. Me. Apr. 16, 2009) ("The parties assume that precedents addressing Title VII's and FMLA's anti-retaliation provisions addressing private employer/employee relationships are applicable to this ADEA federal employee retaliation dispute.").

11

definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . , utilized in Title VII cases is appropriate in the ADEA context.").

Once a *prima facie* case is established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  If this is accomplished, the burden shifts back to the plaintiff to show that the employer's proffered reason is a pretext for retaliatory conduct.  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991).

Proof that the employer violated the ADEA in the first instance is not a prerequisite to a finding of retaliation.  "It is enough that the plaintiff had a reasonable, good-faith belief that a violation occurred; that he acted on it; that the employer knew of the plaintiff's conduct; and that the employer lashed out in consequence of it."  *Id.* at 827.

### 1.   *Prima Facie* Case

### a.   Protected Activity

The first requirement is that the plaintiff produce evidence that he engaged in protected conduct.  An employee has engaged in activity protected under the ADEA if he "has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]."  29 U.S.C. § 623(d); *Fantini*, 557 F.3d at 32.  Plaintiff here clearly engaged in protected activity by virtue of his participation in EEO processes arising from his allegations of age discrimination.

### b.   Adverse Employment Action

The second requirement is that the plaintiff produce evidence that he was subjected to an adverse employment action.  That requirement is met here by the evidence of harassing conduct

12

targeting plaintiff.[8]

Defendant, however, contends that any such actions were not materially adverse, and thus not actionable. Under the law, anti-retaliation provisions apply to "those (and only those) employer actions that would have been materially adverse to a reasonable employee . . . . [T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 56 (2006).[9] The protection afforded "does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id.* at 68. "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. . . . [A]n act that would be immaterial in some situations is material in others." *Id.* at 69.

It is true that some of the episodes, viewed in isolation, consist of apparently petty slights and minor annoyances. But at least some of Mulvey's actions were not trivial. According to plaintiff, warning letters, threats of an AWOL finding, and threats concerning the use of his vehicle were all serious. Furthermore, although some of the events to which he points appear quite minor, there is adequate evidence of a persistent and systematic campaign of harassment. A campaign of petty harassment that is trivial in detail may nonetheless be substantial in gross. *See Bart v. Telford*, 677 F.2d 622, 626 (7th Cir. 1982) (addressing retaliation for conduct protected by the First Amendment).

_____

[8] Plaintiff first met with the EEO counselor on April 16, 2003, which is the latest possible date by which Mulvey could have discovered that plaintiff had initiated an EEO process. Mulvey stated in his EEO affidavit that he excused plaintiff from his work area specifically to enable him to meet with the EEO counselor.

[9] *Burlington Northern* involved a private-sector Title VII retaliation claim. It appears, however, that the same standard applies to claims under the federal-sector ADEA, given the similar goals of the statutes.

13

"[W]orkplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases." *Noviello v. City of Boston*, 398 F.3d 76, 89 (1st Cir. 2005) (holding "explicitly that a hostile work environment . . . is cognizable as a retaliatory adverse employment action"); *see also Chungchi Che v. MBTA*, 342 F.3d 31, 40 (1st Cir. 2003). "In order to prove a hostile work environment, a plaintiff must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." *Noviello*, 398 F.3d at 92.[10] "In deciding whether the harassment was sufficiently severe or pervasive, the fact finder must examine all the circumstances[, including] the frequency and severity of the . . . conduct, . . . whether the conduct unreasonably interfered with the employee's work performance, and the effect of the conduct on the employee's psychological well-being." *Chungchi Che*, 342 F.3d at 40 (internal citations omitted).

Plaintiff has produced sufficient evidence in this regard to survive summary judgment. Among other things, "false accusations of misconduct" and "work sabotage, exclusion, [and] denial of support" can all "contribute to the creation of a hostile work environment." *Noviello*, 398 F.3d at 93-94. There is evidence here of a campaign of harassment after plaintiff initiated the EEO process that might have dissuaded or deterred a reasonable worker from making or supporting a charge of discrimination.

### c.    Causal Connection

---

[10] Although *Noviello* involved a Title VII claim, again, the similarity of statutory purposes supports broader application of this holding to the present case. "Harassment by coworkers as a punishment for undertaking protected activity is a paradigmatic example of adverse treatment spurred by retaliatory motives and, as such, is likely to deter the complaining party (or others) from engaging in protected activity. Reading the statute to provide a remedy for retaliatory harassment that expresses itself in the form of a hostile work environment thus furthers the goal of ensuring access to the statute's remedial mechanisms." 398 F.3d at 90.

The third requirement is that the plaintiff produce evidence of a causal connection between the protected activity and the alleged retaliaton.  Mulvey's knowledge of the EEO action against him, and his comments during the service talk, are sufficient to raise a plausible inference of a causal connection to the adverse actions taken afterwards.  *See Mesnick*, 950 F.2d at 828 ("There are many sources of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment or directed verdict hurdles.  These include, but are not limited to . . . comments by the employer which intimate a retaliatory mindset.") (citations omitted).

### 2.      Proffer of Legitimate, Non-Retaliatory Reason

Plaintiff has thus made out a *prima facie* case.  Defendant has done nothing to rebut it, or to proffer a legitimate, non-retaliatory reason for Mulvey's conduct.  Thus, summary judgment will be denied.  *See Mesnick*, 950 F.2d at 824-25.

### C.      Whether Plaintiff Can Assert His Remaining Claims

Even though the claim survives the burden-shifting analysis, substantial issues remain. Defendant notes that plaintiff filed multiple grievances concerning the conduct at issue in this litigation, all of which appear to have been successful; among other things, the various adverse actions taken against him were withdrawn, sometimes with an award of back pay.[11]

### 1.      Whether the Claims Have Been Released or Satisfied

Defendant contends that the retaliation claims should be dismissed on grounds of release

---

[11] Furthermore, to the extent that plaintiff sought an injunction against future harassment, that request for relief has been mooted by his retirement from the Postal Service.

and satisfaction.[12]  Defendant, however, does not cite any authority for this proposition, and the

available authority appears to point in the opposite direction.[13]

It is certainly true, as a general matter, that where an employee succeeds in obtaining a

remedy through internal grievance procedures, he cannot bring the same claim in a subsequent

lawsuit.  *See EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1542 (9th Cir. 1987) (noting

that an employee's private "settlement [of conduct that was the subject of an EEOC claim] has

rendered her personal claims moot."); *Johnston v. Jago*, 691 F.2d 283, 287 (6th Cir. 1982) ("The

arbitrator sustained the plaintiff's grievance and ordered that she be retroactively promoted with

back pay.  This relief mooted her requests for relief in the district court action.").[14]

There may not, however, be complete congruence between the subject matter of the

resolved grievances and the statutory claims.  In other contexts, the Supreme Court has

emphasized the independence of statutory discrimination remedies from other pre-existing

remedies available to an aggrieved employee.  *See International Union of Elec., Radio & Mach.*

*Workers, AFL-CIO, Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 236-37 (1976)

("[C]ontractual rights under a collective-bargaining agreement and the statutory right provided by

---

[12] Defendant contends that plaintiff's retaliation claims should be dismissed as "claims released by the plaintiff through the successful resolution of his grievances pursuant to the negotiated grievance process.  It should be noted that the plaintiff settled his grievances and achieved full satisfaction.  The plaintiff would be entitled to no further relief."  (Def. Reply at 3.)

[13] On the record before the Court, there is no evidence that plaintiff ever made a release or waiver of any kind, let alone executed a release that specifically relinquished any rights he might have under the ADEA.  As plaintiff states: "Except for one grievance that Postmaster Mulvey conceded at Step 1, I was not involved in the settlements and did not even agree to them—only the union representative is at Step 2 grievances and she could do whatever she wanted without my consent.  The grievance settlements didn't specifically refer to ADEA (because they weren't about the ADEA).  I did not have a lawyer and wasn't told to have one look at the settlement, and I couldn't have done anything even if I did have a lawyer."  (Pl. Sur. at 4.)

[14] *Johnston v. Jago* has been partially overruled on other grounds by *Buckhannon Bd. and Care Home, Inc. v. W.Va. Dep't of Health and Human Resources*, 532 U.S. 598 (2001).

Congress under Title VII 'have legally independent origins and are equally available to the aggrieved employee.'") (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974)); *see also Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571-72 (9th Cir. 1973) (holding that where plaintiff alleged "a chain of incidents indicative of a policy of racial discrimination," the fact that some of the incidents had been addressed in a union grievance procedure did not render the case moot, as plaintiff "may be entitled to injunctive relief from future manifestations of the alleged policy as well as money damages for past injuries.").

Nevertheless, it is also clear that a plaintiff cannot enjoy a double recovery for the same injury. *See Oubichon*, 482 F.2d at 572-73 (noting that "it is generally agreed that double recovery is to be avoided," but that "[e]ven where the employee receives an award or a settlement as in the present case, judicial relief can be tailored to avoid duplication and windfall gains."). Thus, even if the previous resolution of some of the incidents through the grievance process does not absolutely preclude a retaliation action, it may nonetheless restrict the scope of any recovery.

In light of these concerns, it is incumbent upon plaintiff to explain what additional relief he is seeking that would not be duplicative. "Settlement of a claim through a grievance procedure or arbitration does not preclude an employee from establishing a Title VII [or, by analogy, ADEA] claim based on the same events, but a grievant's acceptance of an arbitration award is prima facie evidence that he has received full compensation for his individual damages, *and he has the burden of proving that what he has received was not a complete settlement of his claim for damages.*" *Clark v. Frank*, 1993 U.S. App. LEXIS 22899, at *6-*7 (9th Cir. Sept. 1, 1993) (emphasis

added) (citing *Oubichon*).[15]

## 2.     The Availability of Recovery on the Remaining Claims

Plaintiff here disclaims any attempt to obtain a double recovery, and has identified at least some additional claims that he contends are sufficient to merit denial of summary judgment.  First, he contends that he is seeking damages for incidents that he did not submit to the grievance process.  At oral argument, he gave as an example the fact that he never filed a grievance concerning the loss of sick leave when Mulvey gave him the wrong return-to-work forms.  Second, he contends that even when his grievances were resolved, he did not always receive everything to which he was entitled; for example, when he grieved the denial of seven days of vacation leave he only received six days.  Third, he seeks damages for emotional distress, medical bills, and attorney's fees, which were unavailable through the grievance process.  Finally, the complaint also seeks declaratory relief, in the form of a declaration that he was the subject of retaliation in violation of a federal statute.

A postal service employee plaintiff can only bring an ADEA claim under 29 U.S.C. § 633a, which is distinct from the ADEA provisions applicable to private-sector employment.  The statute provides that:  "Any person aggrieved may bring a civil action in any Federal district court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of

---

[15] In *Clark*, the plaintiff, also a postal service employee, had been suspended for eight days pending investigation of an altercation with a customer on his delivery route.  Plaintiff raised the issue of the suspension through the collective bargaining grievance procedure and ultimately reached a settlement agreement by which he received back pay to compensate him for the full length of the suspension.  An EEOC administrative law judge subsequently determined that plaintiff's discrimination allegation in connection with that suspension was unsupported.  The Ninth Circuit concluded that because plaintiff "had received full compensation for the suspension, and presented no argument or evidence suggesting that the settlement was not a complete settlement of his claim or was not based on the full range of issues cognizable under Title VII, the district court did not err by determining that the claim based on [his] eight-day suspension was moot."  *Id.* at *7.

18

this Act." 29 U.S.C. § 633a(c).  However, as discussed below, the case law applying the federal-sector ADEA has limited the universe of "legal or equitable relief" available in such cases.  Nor is relief afforded by the private-sector provisions of the ADEA—and the case law interpreting and applying them—applicable to the claim of a federal employee, such as plaintiff.[16]  Based on the applicable law, it appears that little of the relief sought by plaintiff is actually available to him.

### a.    Pain and Suffering

Although it is not an entirely settled question, it appears that "physical and mental harm" are not compensable under the ADEA.  The ADEA does not permit a separate recovery of compensatory damages for pain and suffering or emotional distress.  *Comm'r v. Schleier*, 515 U.S. 323, 326 (1995); *Collazo v. Nicholson*, 535 F.3d 41, 45 (1st Cir. 2008) ("Although we have recognized hostile work environment claims under the ADEA, it is well-established that the statute does not allow compensatory damages for pain and suffering.") (internal citation omitted).[17]

Questions of sovereign immunity further complicate the issue.  "No circuit has decided whether the 'legal or equitable relief' clause of § 633a(c) waives sovereign immunity from damages for emotional distress in an age discrimination action based on retaliation.  [I]t is

---

[16] *See Nowd v. Rubin*, 76 F.3d 25, 27 (1st Cir. 1996) ( "[S]ubsection 633a(f) flatly states that any ADEA claim brought by a public sector employee under new section 633a is neither affected by nor subject to 'any provision of . . . [the ADEA], other than the provisions of section 631(b) of this title [pertaining to age limits] and the provisions of this section [633a].' . . .  [T]he explicit restriction set forth in subsection 633a(f) at the time that section 633a (including subsection 633a(c)) was enacted, plainly provides that section 633a is a self-contained provision applicable exclusively to ADEA claims against public sector employers.") (quoting 29 U.S.C. § 633a(f)).

[17] There is authority, however, holding that damages are available in ADEA *retaliation* claims as distinct from ADEA *discrimination* claims.  *See, e.g.*, *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 283 (7th Cir. 1993) ("An exception to the narrow construal of 'legal relief' has been recognized for the case in which the plaintiff charges that he was retaliated against for exercising his rights under the age discrimination law.  In *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108, 112 (7th Cir. 1990), we treated this provision as creating a tort for which the usual common law damages can be obtained.") (internal citations omitted).

established law in this and most other circuits that, in general, separate damages for emotional

distress are not available under identical 'legal or equitable relief' clauses in private sector ADEA

cases." *Villescas v. Abraham*, 311 F.3d 1253, 1258-59 (10th Cir. 2002).

In *Villescas*, the Tenth Circuit concluded that pain and suffering damages are not available

under the federal-sector ADEA:

> We conclude that Congress did not intend to create a two-tiered system of
> damages under § 633a(c), waiving the government's immunity from open-ended
> damages for emotional distress related to discrimination based on retaliation, as
> differentiated from all other forms of discrimination.  Neither the text of the statute
> nor the legislative history support the claim that the language in § 633a(c) contains
> a special subcategory of damages relating to retaliation claims.  To the contrary,
> when Congress enacted § 633a, it omitted, for example, any provision for damages
> for willful discrimination, as set out in § 626(b).  It would be anomalous to
> conclude that Congress would decline to waive sovereign immunity for capped
> damages for willful discrimination, yet be deemed to have waived sovereign
> immunity for unlimited compensatory damages for intangible, non-economic
> injuries such as emotional distress (notwithstanding the former is punitive and the
> latter compensatory).  That conclusion is further bolstered by the fact that
> Congress had opportunities both in 1978 and 1991 to extend common law tort
> compensatory damage relief to apply to federal worker suits under § 633a, and
> declined to do so.  We must presume that Congress was aware at those times, and
> during all the years since 1974 when § 633a was passed, that the general rule
> announced by the courts was to forbid damages for emotional distress, and chose
> not to interfere with that rule.

311 F.3d at 1261, *quoted in Collazo*, 535 F.3d at 44 n.3; *accord Smith v. Office of Pers. Mgmt.*,

778 F.2d 258, 263 (5th Cir. 1985) (holding that "damages for pain and suffering are not

recoverable in a suit against the government under the ADEA").  Based on that authority, the

Court concludes that plaintiff cannot recover pain and suffering damages.

**b.**     **Medical Expenses**

Similarly, claims for medical expenses are generally included in the category of

compensatory damages that are not available under the ADEA (except, in some circuits, for

retaliation in private-sector ADEA cases).  *See, e.g.*, *Blum v. Witco Chemical Corp.*, 829 F.2d

367, 376 (3d Cir. 1987) ("In addition to a front pay award, the jury awarded $5,000 to each

plaintiff for pain and suffering and $1,840 to Blum for medical expenses.  We have held that such

damages are not recoverable under the ADEA.").[18]

### c.      Attorney's Fees

Finally, awards of attorney's fees are not available against the United States under the

federal-sector ADEA.  *Nowd v. Rubin*, 76 F.3d 25, 28 (1st Cir. 1996) ("[T]he ADEA itself does

not authorize attorney fee awards against the United States.") (internal citations omitted).[19]

*      *      *

In light of the above, the relief available to plaintiff is limited to recovery of any remaining

back pay (for the loss of vacation leave, sick leave, or otherwise) and declaratory relief.

---

[18] Again, some circuits make an exception to this rule in ADEA retaliation cases.  *See Lyons v. Hader-Seitz, Inc.*, 2005 U.S. Dist. LEXIS 45462, at *3 (E.D. Wis. Aug. 19, 2005) ("Hader-Seitz moved to strike Lyons' demand for punitive and compensatory damages, including damages derived from medical expenses.  Compensatory and punitive damages are not available under the ADEA, except for retaliation claims.") (citing, inter alia, *Moskowitz*, 5 F.3d at 283-84).  Based on the reasoning of *Villescas*, the Court declines to adopt that approach.

[19] However, the Equal Access to Justice Act nonetheless allows district courts, in their reasonable discretion, to award attorney's fees to successful federal-sector ADEA plaintiffs.  *See generally Nowd*, 76 F.3d at 28-29 (holding "that the ADEA, 29 U.S.C. § 633a, does not mandate an award of attorney fees and expenses against the United States for the benefit of a prevailing public sector employee, but that the EAJA, 28 U.S.C. § 2412(b), nonetheless permits a discretionary award of attorney fees and expenses against the United States for the benefit of a prevailing ADEA claimant").  But there are differences between ADEA and EAJA attorney fee awards, including rate caps.  *See Villescas v. Richardson*, 145 F. Supp. 2d 1228, 1230-31 (D. Colo. 2001).  Plus, "the EAJA provides that the United States is not required to pay the other party's attorney fees if its position in litigation was substantially justified."  *Id.* at 1231.

In addition, the First Circuit has held that an earlier version of the EAJA "does not authorize an award of attorney's fees to a pro se litigant."  *Crooker v. EPA*, 763 F.2d 16, 17 (1st Cir. 1985) (per curiam).  Indeed "the general rule is that *pro se* litigants are not entitled to attorneys' fees."  *Giannetta v. Boucher*, 1992 U.S. App. LEXIS 33313, at *19 (1st Cir. Dec. 22, 1992) (per curiam); s*ee also*, *Lovell v. Snow*, 637 F.2d 170 (1st Cir. 1981). However, while plaintiff is now proceeding *pro se* he did initially retain counsel and it is possible that he incurred attorney's fees prior to the point at which he began representing himself.  Should plaintiff move under the EAJA in the future, the Court will address the issue at that time.

Nonetheless, summary judgment as to those claims will be denied.

**III.**     **Conclusion**

For the foregoing reasons, defendant's motion for summary judgment is DENIED.

**So Ordered.**

 /s/ F. Dennis Saylor_____
F. Dennis Saylor IV
United States District Judge

Dated: July 22, 2009